<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **COMCAST OF NEW JERSEY, LLC,**<br><br>Petitioner,<br><br>v.<br><br>**IBEW LOCAL UNION NO. 827,**<br><br>Respondent. | Civil Action No. 21-cv-17050 (ZNQ) (DEA)<br><br>**OPINION** |

<u>**QURAISHI, District Judge**</u>

**THIS MATTER** comes before the Court upon Petitioner Comcast of New Jersey, LLC's ("Petitioner" or "Comcast") Petition and Motion to Vacate the Arbitration Award ("the Motion") (ECF Nos. 1, 18). Petitioner filed a brief in support of the Motion ("Moving Br.", ECF No. 18-1), along with a Reply. ("Reply Br.", ECF No. 18-3.) Respondent IBEW Local Union No. 827 ("Respondent") filed a Cross-Motion to Confirm Arbitration Award (ECF No. 15-1), along with a memorandum of law in support of its Cross Motion. ("Opp'n Br.", ECF No. 15-3).

The Court has carefully considered the parties' submissions and decided the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will DENY Petitioner's Motion to Vacate the Arbitration Award and will GRANT Respondent's Cross-Motion to Affirm the Arbitration Award.

**I.     BACKGROUND AND PROCEDURAL HISTORY**

On July 29, 2020, Petitioner's managers Josh Cosulich ("Cosulich") and Steve Morrison ("Morrison") convened a virtual team meeting via Microsoft Teams for their employees. (Petition

1

¶ 10.) Cosulich and Morrison heard Mike Bernabe ("Bernabe"), an employee say, "Fuck fuck motherfucking, n-[word], fuck." (*Id.* ¶ 11.) Immediately after Bernabe said this, several individuals in the virtual meeting informed him that he was not on mute. (*Id.* ¶ 14.) Bernabe then disconnected from the meeting. (*Id.*) Multiple employees, including at least one African American employee, attended the virtual meeting. (*Id.* ¶ 15.) Employees complained to Cosulich and Morrison about Bernabe's statements. (*Id.* ¶ 16.) After signing off the virtual meeting, Bernabe sent a message to Cosulich that stated, "LOL sorry I was singing I had my rap song cranked up." (*Id.* ¶ 17.) Bernabe also sent a text message to Morrison that stated, "Lol sorry I had my rap song cranked up and was singing to it and was like holy shit I better lower it lol If you were on lol have a good one." (*Id.* ¶ 18.)

Cosulich and Morrison reported Bernabe's statement to their manager. (*Id.* ¶ 19.) Comcast Human Resources was contacted and began an investigation later in the morning on July 29, 2020. (*Id.*) As part of the call, Bernabe was placed on administrative leave on July 29, 2020. Human Resources interviewed Bernabe and others present on the Microsoft Teams call. (*Id.* ¶ 21.) During Bernabe's interview, Bernabe claimed that he was singing along to a rap song by his favorite rap artist, "Tekashi69," when he made his outburst and did not realize he was un-muted. (*Id.* ¶ 22.) Petitioner asserts that Tekashi69 has not published a song with lyrics that include the words of Bernabe's outburst. (*Id* ¶ 23.)

Bernabe was aware of Petitioner's Code of Conduct. (*Id.* ¶ 26.) The use of the "n-word" by a Comcast employee violates Comcast's policies. (*Id.* ¶ 27.) As a result of Bernabe's use of a racial slur in the business meeting, Petitioner terminated his employment. (*Id.* ¶29.)

Petitioner and Respondent were parties to a collective bargaining agreement ("CBA") effective from January 14, 2018 through January 13, 2021. (*Id.* ¶ 30.) The CBA contains a

grievance and arbitration procedure that allows Respondent to file grievances challenging certain actions by Petitioner. (*Id.* ¶ 31.) Respondent filed a grievance challenging Bernabe's termination. (*Id.* ¶ 32.) The parties proceeded with the grievance through each step required by the CBA. (*Id.* ¶ 33.)

On March 31, 2021, the parties appeared before Arbitrator Melissa H. Biren for a hearing on the grievance challenging Bernabe's termination. (*Id.* ¶ 34.) Ultimately, the Arbitrator's award (the "Award") required that Petitioner revoke Bernabe's termination of employment and reinstate him to the same position and location as worked prior to the termination of employment. (*Id.* ¶ 37(a).) The Award additionally required that Petitioner provide Bernabe with full back pay from the date of discharge to the date he was restored to employment. (*Id.* ¶ 37(b).) Finally, the Award required Comcast to restore Bernabe's seniority and benefits. (*Id.* ¶ 37(c).) The Award did, however, implement a five-day suspension without pay for Bernabe. (Award, ECF No. 18-2, at 11).

On September 16, 2021, Petitioner filed a Petition to Vacate the Arbitration Award (ECF No. 1), along with the Arbitration Award of July 12, 2021 (ECF No. 1-1) and the Collective Bargaining Agreement ("CBA", ECF No. 1-4). That same day, Petitioner filed its first Motion to Vacate the Arbitration Award. (*See* ECF No. 3.) On November 1, 2021, Respondent filed a "Response", which included a Notice of Cross-Motion to Confirm the Arbitration Award (ECF No. 1-1), along with a Memorandum of Law in support of its Cross-Motion (hereinafter referred to as "Opp'n Br.", *see* ECF No. 15-3.) Due to repeated extension requests by Petitioner, the Court ordered it to serve remaining briefs on the Motions on the same day that briefing is complete, together with a new notice of motion; in the meantime, the Court administratively terminated the

Motion. (*See* ECF No. 17.) On November 29, 2021, Petitioner re-filed its motion along with its brief in support and a reply. (*See* ECF No. 18.)

## II.  LEGAL STANDARD

Within one year after the entry of an arbitration award, "any party to the arbitration may apply to [a district court in the district where the award was made] for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected." 9 U.S.C. § 9. "Courts play a very limited role in reviewing the decision of an arbitrator appointed pursuant to a collective bargaining agreement." *Citgo Asphalt Refining Co. v. PACE Int'l Union, Local No. 2-991*, 385 F.3d 809, 815 (3d Cir. 2004). A court reviews an arbitration award "under an 'extremely deferential standard,' the application of which 'is generally to affirm easily the arbitration award.'" *Hamilton Park Health Care Ctr. v. 1199 SEIU United Healthcare Workers E.*, 817 F.3d 857, 861 (3d Cir. 2016) (quoting *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003)).

An arbitration award is subject to vacatur on four exclusive grounds: (1) "where the award was procured by corruption, fraud, or undue means"; (2) "where there was evident partiality or corruption in the arbitrators"; (3) "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced"; or (4) "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a).

"There is a strong presumption under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, in favor of enforcing arbitration awards." *Brentwood Med. Assocs. v. United Mine Workers of Am.*,

396 F.3d 237, 241 (3d Cir. 2005). Courts will vacate an award only under the "exceedingly narrow circumstances" listed in 9 U.S.C. § 10(a). *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 251 (3d Cir. 2013). Additionally, a court may refuse to enforce an award that violates law or a "well-defined and dominant" public policy. *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir.1993). "[A] court's refusal to enforce an arbitrator's interpretation of [a] contract[ ] is limited to situations where the contract as interpreted would violate 'some explicit public policy' that is 'well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987) (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983) (internal quotation marks omitted)).

The moving party "bears the burden of proving that the arbitration award at issue should be vacated." *Jersey Shore Univ. Med. Ctr. v. Local 5058, Health Prof'ls & Allied Emps.*, Civ. No. 16-4840, 2017 WL 1025180, at *3 (D.N.J. Mar. 16, 2017) (citation omitted).

### III. DISCUSSION

Petitioner moves to vacate the Award for Respondent. It identifies two bases for vacatur: 1) enforcement of the Award "would violate federal and state law and public policy against racial harassment," and 2) the Award fails to draw its essence from the CBA. (Moving Br. at 3.) The Court will discuss each basis in turn.

#### A. Federal and State Law and Public Policy

##### 1. *Federal and State Law*

Petitioner argues that Federal law explicitly prohibits employers from subjecting employees to discrimination, harassment, or a hostile work environment on the basis of race, citing to Title VII of the Civil Rights Act of 1964. (*Id*. at 6–7.) Additionally, New Jersey law prohibits

employers from subjecting employees to discrimination, harassment, or a hostile work environment on the basis of race. (*Id*. at 7.) Petitioner asserts that the goal of the New Jersey Law Against Discrimination ("NJLAD", N.J.S.A. 10:5-1, *et seq*.) is to eradicate the "cancer of discrimination." (*Id*.) Further, it cites to *Rios v. Media Pharmaceutical*, Inc., 247 N.J. 1 (2021) and *Nuness v. Simon & Schuster, Inc*., 325 F. Supp. 3d 535 (D.N.J. 2018) to argue that a single use of a racial epithet is enough to state a claim for a hostile work environment. (*Id*. at 7–8.)

Petitioner argues that federal law explicitly prohibits employers from subjecting employees to discrimination, harassment, or a hostile work environment, and cites to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). (Moving Br. at 6–7.) In *Harris*, the plaintiff was "*often* insulted because of her gender and *often* the target of unwanted sexual innuendos." 510 U.S. at 20 (emphases added). The Court found that a Title VII prohibits "requiring people to work in a discriminatory hostile or abusive environment." *Id*. at 21. The Court observed that whether an environment is hostile can be determined by looking at all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23. While the *Harris* decision may set forth standards for actionable hostile work environment claims under Title VII, it fails to support Petitioner's position that a single utterance of a racial slur creates a hostile work environment.

Petitioner argues that New Jersey Law also prohibits racial discrimination via the NJLAD. In support, Petitioner cites to a recent New Jersey Supreme Court case applying the NJLAD, *Rios v. Meda Pharmaceutical, Inc.*, 247 N.J. 1 (2021), as an example of how in New Jersey, a single

use of a racial epithet can be sufficient to state a claim for hostile work environment.[1] (Moving Br. at 7.) Respondent argues that subsequent to the New Jersey Supreme Court's ruling in *Rios*, the New Jersey Appellate Division found it to be an extreme and rare case in which a single incident of harassment will be so severe to create a hostile work environment, citing to *Kitchen v. Springpoint Senior Living*, No. A-3085-19, 2021 WL 4437880, at *6 (N.J. Super. Ct. App. Div. Sept. 28, 2021). (Opp'n Br. at 10.)

Petitioner also contends that employers can be held liable for racial epithets used by non-supervisors if the employer fails to take prompt action, citing to *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). (*Id.* at 8–9.)

In response by way of a cross motion to affirm the arbitration award, Respondent argues that Petitioner offers no supporting case law directly on point to vacate the Award. (Opp'n Br. at 8.) Respondent asserts that Petitioner's reliance on *Rios*, 247 N.J. 1 is misplaced because no New Jersey court has found that one utterance from a "rank and file" employee qualifies as per se harassment. (*Id.* at 10.)

NJLAD is "intended to 'protect the civil rights of individual aggrieved employees' as well as 'the public's strong interest in a discrimination-free workplace.'" *Rios*, 247 N.J. at 9 (quoting *Lehmann v. Toys 'R' Us*, 132 N.J. 587, 600 (1993)). In *Lehman*, the New Jersey Supreme Court held that to state a claim under NJLAD, a plaintiff must allege "the complained of conduct (1) would not have occurred but for the employee's [race]; and it was (2) severe or pervasive enough to make a (3) reasonable [person of that race] believe that (4) conditions of employment are altered

---

[1] In *Rios*, the plaintiff was subjected to two separate incidents of racial comments by his supervisor. *Id.* at 6. The Court found that both comments were directed at the plaintiff. *Id.* at 14, 15. Ultimately, the Court held that a "rational fact finder could conclude the alleged conduct was sufficiently severe or pervasive to create a hostile work environment." *Id.* at 16.

and the working environment is hostile or abusive."[2] 132 N.J. at 603–04. The second element, whether the conduct was severe or pervasive, must be measured by the surrounding circumstances. *Rios*, 247 N.J. at 11 (citing *Taylor v. Metzger*, 152 N.J. 490, 499–500). The New Jersey Supreme Court in *Rios*, however, indicated that "in rare and extreme cases, a single incident can create a hostile work environment. *Id*. Further, settled case law relies on an objective standard to evaluate a hostile work environment claim, focusing "on the harassing conduct itself and not its effect on the plaintiff or on the work environment.'" *Id*. at 12 (quoting *Lehman*, 132 N.J. at 606).

Petitioner additionally cites to *Nuness v. Simon & Schuster, Inc.*, 325 F. Supp. 3d 535 (D.N.J.) to reinforce its argument that a single use of a racial epithet is enough to state a claim for a hostile work environment. Respondent argues that the District Court in *Nuness* did not find that a single racial epithet automatically satisfies a hostile work environment claim.[3] (Opp'n Br. at 11.)

While Petitioner is correct in stating that a single use of a racial epithet may be enough to state a claim for a hostile work environment, it fails to take into consideration that the severity and pervasiveness of the conduct must also be measured by the surrounding circumstances. *See Rios*, 247 N.J. at 11; *see also Nuness*, 325 F. Supp. 3d at 549. In *Rios*, a supervisor made two racially degrading comments directed at the plaintiff. In *Nuness*, a co-worker made a single racial

---

[2] The *Lehman* Court analyzed a NJLAD claim for sex-discrimination. However, the *Lehman* standard applies generally to hostile work environment claims, including those based on racial comments. *Rio*, 247 N.J. at 10.

[3] In *Nuness*, the plaintiff's co-worker called her a contraction of the "n-word" and "pig." 325 F. Supp. 3d at 546. While the District Court in *Nuness* ultimately found reasonable a factfinder's conclusion that this remark was severe, *id*. at 549, the Court indicated that severe and pervasive conduct "may be distinguishable from the 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee.'" *Id*. (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Further, the Court held that '[d]iscourtesy or rudeness should not be confused with racial harassment' and that 'a lack of racial sensitivity does not, alone, amount to actionable harassment.'" *Id*. at 788 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Accordingly, 'simple teasing, off hand comments, and isolated incidents (unless extremely serious)' are not sufficient." *Id*. (quoting *Faragher*, 524 U.S. at 788).

comment in the course of directing a sexually charged remark at the plaintiff. 325 F. Supp. 3d. at 548.

Here, an employee uttered a racial slur during a virtual work-related meeting. The slur was not directed at any employee and Petitioner fails to indicate to whom or to what the comment referred. Rather, Bernabe claims he was singing along to a rap song by his favorite rap artist, Tekashi69, and did not realize he was un-muted. (Petition ¶ 22.) After uttering the racial slur, Bernabe reached out to two of his supervisors, apologized for his outburst, and again indicated that he was singing a rap song. (*Id*. ¶ 17, 18.) Although the comment was overheard by other employees on the call, including an African American employee, the comment was not directed at anyone and was made while Bernabe believed no one could hear him.

While the Court admonishes this type of language as wholly inappropriate and unacceptable in a work-related setting, the Third Circuit has recognized that "[c]omments referring to other individuals that [are] merely overheard are the sorts of 'offhanded comments and isolated incidents' that the Supreme Court in *Faragher* cautioned should not be considered severe or pervasive enough to constitute a hostile work environment." *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005) (internal citation omitted). Accordingly, the Court finds that the comment did not create a hostile work environment and the Award does not violate federal or New Jersey law.[4]

### 2. *Public Policy*

Petitioner also argues that enforcement of the Award would violate public policy prohibiting employers from subjecting employees to a racially hostile workplace. (Moving Br. at

---

[4] Given the Court's conclusion that Bernabe's remark was not sufficient to create a hostile work environment, it does not reach Petitioner's argument that employers can be liable for racial epithets used by non-supervisors if the employer fails to take prompt and remedial action.

9

10.) In particular, Petitioner asserts that the Award violates the rule set forth in *Stroehamm Bakeries, Inc. v. Local 776, Intern. Broth. of Teamsters*, 969 F.2d 1438 (3d Cir. 1992), which held that "an award which fully reinstates an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy." (Moving Br. at 10.)

Respondent asserts that subsequent decisions have distinguished *Stroehamm Bakeries* and enforced awards that levied a suspension rather than a reinstatement, citing to multiple extra-jurisdictional decisions, including *Way Bakery v. Trucker Drivers Local No. 164*, 363 F.3d 590, 595-596 (6th Cir. 2004) and *Weber Aircraft Inc. v. General Warehousemen & Helpers Local 767*, 253 F.3d 821, 823, 826 n.3 (5th Cir. 2001). (Opp'n Br. at 9.)

Further, Respondent argues that an isolated incident of inappropriate speech does not implicate public policy because it does not create a hostile work environment. (*Id*. at 11.) In its view, public policy does not require the termination of employees whose actions create a hostile work environment. (*Id*. at 11.) Rather, the employer need only take some remedial action. (*Id*.) Respondent argues that the arbitrator's imposition of a week-long suspension comports with public policy. (*Id*. at 12.)

In reply, Petitioner argues that Respondent fails to recognize that the Award violates the public policy prohibiting harassment in the workplace. (*Id*.) The Award explicitly found that Bernabe engaged in the misconduct alleged, yet it reinstated Bernabe to his previous position and location. (*Id*. at 3.) Additionally, Petitioner argues that the Award violates the public policy that favors remediating harassment in the workplace. (*Id*.)

"[A] court may not enforce a collective-bargaining agreement that is contrary to public policy," and "the question of public policy is ultimately one for resolution by the courts." *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983). The Supreme Court in *W.R. Grace*

cautioned that a court's refusal to enforce an arbitrator's interpretation of collective bargaining agreements is limited to situations "where the contract as interpreted would violate 'some explicit public policy' that is 'well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id*. (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)). "An alleged public policy must be properly framed under the approach set out in *W.R. Grace*, and the violation of such a policy must be clearly shown if an award is not to be enforced." *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43 (1987). "The public policy exception to the enforcement of arbitration awards is slim indeed." *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 382 (3d Cir. 1995) (quoting *Service Employees Int'l Union Local 36 v. City Cleaning Company, Inc.*, 982 F.2d 89, 92 (3d Cir. 1995) (internal quotation marks omitted)). In order to trigger the exception, a party must show that the "award create[s] an explicit conflict with an explicit public policy." *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 382 (3d Cir. 1995). That is, in determining "whether an award violates public policy, the analysis turns on whether the arbitrator's award 'created any explicit conflict with other laws and legal precedents rather than an assessment of general considerations of supposed public interests.'" *D.A. Nolt, Inc. v. Local Union No. 30 United Union of Roofers, Waterproofers & Allied Workers*, 661 F. Appx 200, 205 (3d Cir. 2016) (citing *Misco, Inc.*, 484 U.S. at 43) (internal citations omitted).

It is clear that in the United States and in New Jersey, there is a public policy against racial discrimination in the workplace, as evidenced by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and NJLAD. At issue, therefore, is whether the Award conflicts with this public policy.

Petitioner argues that the award violates the rule set forth in *Stroehmann Bakeries, Inc., v. Local 771 Int'l Brotherhood of Teamsters*, 969 F.2d 1436 (3d Cir. 1992). There, the Third Circuit held that "an award which fully reinstates an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy. *Id*. at 1442. Doing so would "[undermine] the employer's ability to fulfill its obligation to prevent and sanction sexual harassment in the workplace. *Id*.

This case, however, is distinguishable from *Stroehmann Bakeries*. Here, the Award found that "[t]here is no dispute that Bernabe engaged in the misconduct alleged" (Award at 7), and that the misconduct was a "violation of the Company's Code of Conduct[.]" (Award at 8.) The Award ultimately found that Petitioner "did not have just cause for discharge" and the penalty was to be "reduced from discharge to a five-day suspension without pay." (Award at 11.) The arbitrator here did not re-instate Bernabe without making a finding of whether the misconduct occurred. Rather, the arbitrator made the specific finding that Bernabe committed the misconduct and determined that the proper penalty was a five-day suspension without pay. Enforcement of the Award does not undermine Petitioner's ability to fulfill its obligation to prevent racial harassment in the workplace because a penalty was in fact implemented.

For these reasons, the Court finds that enforcement of the Award does not create an explicit conflict with public policy.

**B. Essence of the Parties' Collective Bargaining Agreement**

Petitioner separately argues that the Award fails to draw its essence from the parties' CBA, but instead imposed the arbitrator's own sense of industrial justice. (Moving Br. at 14.) Petitioner asserts that the arbitrator failed to identify any provision of the CBA that empowered her to decide the appropriate level of discipline, and there is no such provision. (*Id*.) Petitioner argues that the

12

arbitrator was limited to deciding whether it had cause for discharge of Bernabe. (*Id*.) Instead, she went beyond her authority and "pulled her determination out of thin air." (*Id* .at 15–16.)

Respondent argues that the Award draws its essence from the CBA by resolving the tension between the "just cause" provision of the Agreement and the company's policy, which provides that a violation may be considered just cause for discipline up to termination. (*Id*. at 14.) Respondent asserts that the decision represents a valid interpretation of the Agreement and the company's anti-harassment policies. (*Id*.)

In reply, Petitioner argues that Respondent failed to adequately respond to its argument that the Award fails to draw its essence from the CBA. (Reply Br. at 6.) Petitioner reiterates that the Award goes far beyond any apparent conflict and reflects only the arbitrator's brand of industrial justice. (*Id*. at 7.)

An enumerated ground to vacate an arbitration award is when "the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). This occurs when he or she "decides an issue not submitted to [arbitration], grants relief in a form that cannot be rationally derived from the parties' agreement and submissions, or issues an award that is so completely irrational that it lacks support altogether." *Sutter v. Oxford Health Plans, LLC*, 675 F.3d 215, 219–20 (3d Cir. 2012). "Indeed, a reviewing court may disturb an arbitrator's award 'only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop.'" *Akers Nat'l Roll Co. v. USW Int'l Union*, 712 F.3d 155, 160 (3d Cir. 2013) (quoting *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969). In other words, a court "must uphold the arbitration panel's award so long as it 'draws its essence' from or 'arguably construes or applies' the parties' contract." *Metromedia Energy, Inc. v. Enserch Energy Servs., Inc*., 409 F.3d 574, 584

(3d Cir. 2005) (quoting *News Am. Pub. v. Newark Typographical Union*, 918 F.2d 21, 24 (3d Cir. 1990)).

An arbitrator's award draws its essence from the collective bargaining agreement if "the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention[.]" *Ludwig Honold Mfg. Co v. Fletcher*, 405 F.2d 1123, 1128 (1969).

It is "not the role of a court to correct factual or legal errors made by an arbitrator." *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 240 (3d Cir. 2005). "When [the arbitrator] makes a good faith attempt to [interpret and enforce a contract], even serious errors of law or fact will not subject his award to vacatur." *Sutter*, 675 F.3d at 220. "The Supreme Court has phrased the same idea in this fashion: 'if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision.'" *Akers*, 712 F.3d at 160 (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)).

Petitioner argues that the Third Circuit's decision in *Monongahela Valley Hosp., Inc. v. United Steel Paper & Forestry Rubber Mfg. Allied Indust. & Serv. Workers Int'l Union AFL-CIO CLC*, 946 F.3d 195 (3d Cir. 2019) supports its argument that the Award did not draw its essence from the words of the CBA. In *Monongahela*, the court held that where the "arbitrator injects a restriction into a contract to which the [employer] did not agree and to which the bargaining unit employees are not entitled, he dispenses his own brand of industrial justice and [the award] should be overturned." 946 F.3d at 201. There, a union on behalf of an employee filed a grievance with respect to vacation days. *Id*. at 198. The collective bargaining agreement explicitly stated that the employer had the final and exclusive right to deny vacation requests. *Id*. at 199. The arbitrator

14


ignored the plain language and ruled against the hospital's denial of the employee's requested vacation. *Id*. at 200. As such, the arbitration award was vacated. *Id*. at 201. Here, however, the Award does not explicitly inject a restriction into the CBA. In fact, Petitioner admits that its policies do not require an employee to be discharged. (Award at 10.)

Further, Petitioner's reliance on *Poland Spring Corp. v. UFCW*, 314 F.3d 29, 31 (1st Cir. 2002) is misplaced. There, the plain language of the collective bargaining agreement provides that "insubordination 'shall' constitute just cause for termination. *Id*. The arbitration award was vacated after it reinstated an employee who was insubordinate. *Id*. at 37.

Here, the CBA states that discharges "for cause and layoffs are the sole function of the Company." (CBA at 5.) Nothing within the CBA requires termination for the misconduct here. Further, nothing within the CBA defines "for cause." The Award interpreted the meaning of "for cause" and whether Petitioner was justified in terminating Bernabe "for cause." As such, the Court finds that the Award's determination that Petitioner had no cause for termination does draw its essence from the CBA.

While the arbitrator found that Petitioner did not have just cause for discharge, she did find that there was just cause for discipline. (Award at 11.) The CBA, however, is silent on the issue of whether discipline can or should be implemented upon a finding of misconduct. The Award analyzed "progressive discipline principles," but, again, the CBA is silent as to whether "progressive discipline" can or should be implemented. Still, the Court is satisfied that the Award was a good faith effort by the arbitrator and that it was derived from the CBA in a rational way, "viewed in light of its language and its context." *See Brentwood Med. Assocs,* 396 F.3d at 240. Under these circumstances, recognizing the extremely deferential standard applied to the Court's

review of an arbitration award, it would be improper to disturb the Award. Accordingly, it will not be vacated.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's Motion to Vacate the Arbitration Award will be DENIED and Respondent's Motion to Confirm the Arbitration Award will be GRANTED. An appropriate order will follow.

Date: **October 31, 2022**

                                             s/ Zahid N. Quraishi
                                             **ZAHID N. QURAISHI**
                                             **UNITED STATES DISTRICT JUDGE**